Vernon **BURNETT**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–10715.

Court of Appeals of Alaska.

Nov. 10, 2011.

Margi A. Mock, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Eric Auten, Assistant District Attorney, Bethel, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

On September 20, 2009, at about 12:30 in the morning, a state trooper observed a vehicle stopped at an intersection. As the trooper watched, the vehicle "peeled out"—spinning its tires as it accelerated—and made a left turn. The trooper stopped the vehicle and, as a result of this stop, the trooper gathered information tending to show that the operator of the vehicle, Vernon Burnett,

was intoxicated. Burnett was charged with driving under the influence, and he was later convicted of this offense.

Before his trial, Burnett asked the district court to suppress all of the evidence stemming from the traffic stop, arguing that the trooper lacked reasonable suspicion to stop him. The district court denied this suppression motion. In this appeal, Burnett renews his argument that there was no valid basis for the trooper to make the traffic stop. For the reasons explained in this opinion, we conclude that the stop was not justified, and we therefore reverse Burnett's conviction.

*A more detailed description of the facts of this case*

On September 20, 2009, at about 12:30 a.m., Alaska State Trooper Lucas Altepeter observed a truck come to a stop at a stop-sign-controlled intersection in Bethel. After coming to a stop, the truck then "peeled out" and made a left turn. The vehicle's tires spun as it accelerated, and the tires continued to spin until the truck was one-third to one-half of the way through the intersection. Altepeter became suspicious that the driver of this truck might be intoxicated, so he initiated a traffic stop. The driver, Burnett, pulled over within a reasonable distance, with no driving errors.

When Altepeter contacted Burnett, he observed that Burnett had a strong odor of alcohol, that he had bloodshot, watery eyes, and that he stumbled a bit as he walked. Altepeter administered field sobriety tests to Burnett, as well as a portable breath test, and (based on the results of these tests) Altepeter arrested Burnett for driving under the influence. Later, Burnett submitted to a breath test at the trooper post; this breath test showed that Burnett had a blood alcohol content of .162 percent (*i.e.*, about twice the legal limit).

Burnett was charged with misdemeanor driving under the influence. Before his trial, he moved to suppress the evidence obtained during the traffic stop, arguing that his stop was not supported by reasonable suspicion to believe he was engaged in wrongdoing.

At the evidentiary hearing on this suppression motion, Trooper Altepeter acknowledged that he did not typically stop a vehicle for losing traction and spinning its tires. He explained that he decided to stop Burnett because he had "never seen somebody accidentally lose traction and spin their tires as fast and as far as this particular vehicle did." Although there was some residual gravel on the asphalt road, Altepeter said that the road was dry and free of mud, snow, or ice. In response to questions by the court, Altepeter testified that he believed he could have issued Burnett a citation for negligent driving based on the tire-spinning alone.

At the conclusion of the hearing, the district court denied Burnett's suppression motion. In its decision, the court did not address the issue of whether the circumstances known to Trooper Altepeter provided reasonable suspicion to believe that Burnett was driving under the influence. Instead, the district court found that Altepeter had probable cause to believe that Burnett had committed the offense of negligent driving. The district court also alluded to the possibility that the traffic stop might be justified under the "community caretaker" doctrine. In his remarks, the judge declared that one role of the police is "keeping people safe, and investigating unsafe behavior, [and] forestall[ing] unsafe behavior". For this reason, the judge suggested that the trooper would be justified in stopping Burnett's vehicle "just to give [him] a safety warning". Ultimately, the district court judge combined both of these rationales in his ruling:

> *The Court*: In this case, the officer … had probable cause or [a] reasonable belief that some action by him to contact the driver of that vehicle was called for—to draw his attention to it, to give him a warning, or, … if he found that it was so egregious, to cite him for negligent driving.

*Why we reverse the district court's decision*

When the question is whether an investigative stop was supported by either probable cause or, at least, reasonable suspicion, "[t]he ultimate inquiry is whether the detaining officer, in light of all the circum-

stances, had a particularized and objective basis for suspecting [that] particular person ... of criminal activity."[1]

■ Because the test is an objective one (once the underlying facts are determined), an appellate court does not defer to the trial court's determination of whether given facts do or do not provide the requisite reasonable suspicion or probable cause to support an investigative stop. Instead, we independently assess whether the facts, as found by the trial court, satisfy the objective test.[2]

See, for instance, *Miller v. State*, 145 P.3d 627, 630 (Alaska App.2006), where this Court independently assessed the given facts and reversed the trial court's conclusion that the stop was justified; and *Snider v. State*, 958 P.2d 1114, 1118 (Alaska App.1998), where this Court independently assessed the given facts and upheld an investigative stop on two bases that were different from the justification offered by the officer who made the stop.

■ In Burnett's case, the district court concluded that the trooper could reasonably suspect that Burnett was engaging in negligent driving. We disagree.

Under AS 28.35.410(a), a person commits the offense of negligent driving if they drive in a manner that creates an unjustifiable risk of harm to a person or to property, *and* if their conduct actually endangers a person or property. According to the statute, proof of this latter element (*i.e.*, that the defendant's driving actually endangered people or property) is established by proof that, as a result of the defendant's driving, (1) an accident occurred; or (2) any person (including the defendant) took evasive action to avoid an accident; or (3) any person (again, including the defendant) stopped or slowed down suddenly to avoid an accident; or (4) any person or property (including the defendant's person or property) was otherwise endangered.

Trooper Altepeter testified that when Burnett accelerated and turned left at the inter-

section, Burnett's tires spun one-third to one-half of the way across the intersection. However, the trooper stated that he did not see Burnett engage in any other improper driving. Altepeter did not assert that Burnett's driving endangered Burnett or anyone else, or that Burnett's driving put property at risk.

■ In its brief to this Court, the State argues that this lack of evidence of actual endangerment "[does] not negate the fact that [Burnett's] erratic driving posed a threat." But a person can not be convicted of negligent driving for creating a theoretical or speculative danger. The statute requires proof of actual endangerment. As this Court explained in *Comeau v. State*,

> [The legislature's] reason for [including a requirement] of an actual endangerment ... in the negligent driving [statute] is obvious: ... the added requirement of actual endangerment is necessary to protect against the possibility that a prosecution for negligent driving—a relatively serious infraction—might be based merely upon commission of some less serious traffic offense. Without the actual endangerment requirement, for example, a driver who exceeded the speed limit by five miles per hour on an empty stretch of highway would be subject to prosecution and conviction for negligent driving.

758 P.2d 108, 115–16 (Alaska App.1988).

We acknowledge that the issue in Burnett's case is not whether the State could prove that Burnett was guilty of negligent driving beyond a reasonable doubt, but merely whether Trooper Altepeter had reasonable suspicion to believe that Burnett was committing this offense. Nevertheless, the State offered absolutely no evidence to suggest that Burnett's driving created an actual danger to persons or property. We therefore reject the district court's conclusion that the traffic stop in this case was justified by a reasonable suspicion that Burnett had com-

---

1. *Miller v. State*, 145 P.3d 627, 629 (Alaska App. 2006), quoting *State v. Moran*, 667 P.2d 734, 735 (Alaska App.1983), which, in turn, was quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

2. *Chandler v. State*, 830 P.2d 789, 792 (Alaska App.1992): "[W]hether probable cause arises from [given] facts ... is a purely legal issue as to which we make a *de novo* determination."

mitted negligent driving in the trooper's presence.

The district court alternatively suggested that the trooper was justified in stopping Burnett "just to give [him] a safety warning"—because one role of the police is "keeping people safe, and ... forestall[ing] unsafe behavior". In its brief to this Court, the State interprets the district court's remarks as a reference to the "community caretaker" function of the police.

In *Ozhuwan v. State,* 786 P.2d 918 (Alaska App.1990), this Court held that a Fourth Amendment seizure may be justified, even when there is no reasonable suspicion of criminal activity, if the police are validly acting within their community caretaker role— that is, if they are aware of specific circumstances giving rise to a reasonable belief that police assistance is required. *Id.* at 922.[3]

■ When the State relies on the community caretaker doctrine to support a Fourth Amendment search or seizure, the State must prove both (1) that the officer *actually* (*i.e.,* subjectively) believed that police assistance was required or requested, and (2) that the circumstances known to the officer *objectively* justified this conclusion. *Crauthers v. State,* 727 P.2d 9, 11 (Alaska App.1986).[4]

This court has upheld community caretaker stops in cases where the facts suggested that a motorist might need assistance, or that police intervention was necessary to address a potential hazard.[5]

In its brief to this Court, the State suggests that Trooper Altepeter might have inferred, from his observation of Burnett's spinning tires, that Burnett was having difficulty driving, caused either by illness or by mechanical trouble, and that Burnett therefore posed a hazard to himself or to the public, even if Burnett had broken no law.

The State relies in particular on this Court's decision in *Crauthers* and this Court's decision in *McKean v. Municipality of Anchorage,* Alaska App. Memorandum Opinion No. 1479 (September 16, 1987), 1987 WL 1357093—two cases in which investigative stops were found to be justified by the community caretaker function.

In *Crauthers,* the driver of a vehicle stopped some thirty feet in front of a yield sign, and then rolled down his window. A trooper on routine patrol activated his overhead lights and contacted the driver, thinking that the driver's unusual actions indicated a need for directions or some other help.[6] This court upheld the stop, concluding that the trooper reasonably interpreted the driver's conduct to be a request for assistance.[7]

In *McKean,* an officer observed the driver of a van stop three times in the middle of the street within one block.[8] The officer initiated a traffic stop because he suspected that the vehicle was malfunctioning or that the occupants were having problems; he did not suspect the driver was intoxicated until the driver failed to yield and ran a red light.[9] This court held that the officer was justified in stopping the vehicle to see if there was a problem.[10]

■ But Altepeter did not testify that he believed Burnett needed assistance, or that the circumstances led him to believe that he needed to intervene to prevent harm to Burnett or to the motoring public (aside from Altepeter's concern that Burnett was intoxicated). Thus, the State presented no evidence

---

**3.** *See also Crauthers v. State,* 727 P.2d 9, 10–11 (Alaska App.1986); *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).

**4.** *See South Dakota v. Opperman,* 428 U.S. 364, 375–76, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976) (upholding an inventory search of an impounded vehicle, in part because there was no indication that the inventory was "a pretext concealing an investigatory police motive", and noting that this was also true with respect to the community caretaker search of a vehicle conducted by the police in *Cady v. Dombrowski* ).

**5.** *Weil v. State,* 249 P.3d 300, 301–02 (Alaska App.2011) (listing cases).

**6.** 727 P.2d at 10.

**7.** *Id.* at 11.

**8.** 1987 WL 1357093 at *1.

**9.** *Ibid.*

**10.** *Ibid.*

to satisfy the subjective prong of the community caretaker doctrine.

We note that the *Crauthers* decision, to the extent it requires the State to present proof of the officer's subjective motivation, is at variance with the normal "objective circumstances" approach to issues of search and seizure. As this Court explained in *Deemer v. State:*

> [Normally,] the propriety of an arrest or a warrantless search is assessed under an objective evaluation of the facts known to the police, rather than on the ... officer's subjective belief or understanding as to why the arrest or the search is justified. The Fourth Amendment is not violated when the arresting officer is unable to correctly articulate the basis for the arrest or the search. Rather, the Fourth Amendment is violated when the arrest or the search is unreasonable under the facts known to the police.

244 P.3d 69, 72 (Alaska App.2010).[11]

However, the State does not argue that *Crauthers* was wrongly decided, and *Crauthers* is the controlling precedent on this issue. Accordingly, the evidence presented in the district court is legally insufficient to support the stop of Burnett's vehicle under the community caretaker doctrine.

The State offers one final justification for the stop in this case: the State suggests that the stop of Burnett's vehicle was justified by a reasonable suspicion that Burnett was driving under the influence.

In its ruling, the district court did not rely on this theory to uphold the stop. Nevertheless, the State—as the appellee in this litigation—is entitled to argue for affirmance of the district court's decision on any legal ground revealed by undisputed facts in the trial court record.[12]

█ A police officer may have reasonable suspicion to believe that a driver is under the influence even though the officer does not observe the driver actually do something dangerous. As this Court explained in *State v. Moran,* 667 P.2d 734 (Alaska App.1983), "[i]t is sufficient if the officer observes facts which [support a reasonable belief] that the person to be stopped *is* dangerous." *Id.* at 736 (emphasis in the original).

Thus, in *Ebona v. State,* 577 P.2d 698, 701 n. 12 (Alaska 1978), our supreme court concluded that the police had a reasonable suspicion to stop the defendant's vehicle because they had earlier observed him walking, apparently intoxicated, and then, about an hour later, they saw him driving a car that weaved within its lane of traffic on two streets. In *Hamman v. State,* 883 P.2d 994, 995 (Alaska App.1994), this Court upheld a traffic stop where the officer observed the defendant's vehicle weave noticeably within its lane of travel, cross the fog line onto the shoulder of the road, and then jerk back into the proper lane.

We have also upheld DUI traffic stops in a number of unpublished decisions.

In *Hooton v. State,* Alaska App. Memorandum Opinion No. 5476 (May 6, 2009), 2009 WL 1259360 at *2, the officer observed the defendant stagger out of a bar and, ten minutes later, saw road workers yelling at the defendant as he drove his vehicle through a line of traffic cones and over a freshly painted crosswalk. In *Brumley v. State,* Alaska App. Memorandum Opinion No. 3263 (October 11, 1995), 1995 WL 17221321 at *1–2, the defendant signaled a left turn and then, after waiting ample time to turn, continued straight, flashing her brake lights several times as she drove away. In upholding this stop, we stated that the unusually long stop in the turn lane, coupled with repeated braking, "reasonably indicated that the ... driver was experiencing ongoing difficulty or impairment rather than simply momentary hesitation or indecision." *Id.* at *2.

In *Delgado v. State,* Alaska App. Memorandum Opinion No. 4140 (October 20, 1999),

**11.** Citing *Bertilson v. State,* 64 P.3d 180, 185 (Alaska App.2003); *Snider v. State,* 958 P.2d 1114, 1117–18 (Alaska App.1998); *Beauvois v. State,* 837 P.2d 1118, 1121–22 n. 1 (Alaska App. 1992); *State v. Kendall,* 794 P.2d 114, 116–17 (Alaska App.1990).

**12.** *Linehan v. State,* 224 P.3d 126, 140 (Alaska App.2010).

1999 WL 34002419 at *1–2, the defendant's vehicle remained stopped at a green light for ten to fifteen seconds, drove through the intersection "almost at a crawl", and then continued to drive slowly for one or two blocks. In *Lewis v. State,* Alaska App. Memorandum Opinion No. 1282 (November 26, 1986), 1986 WL 1161162 at *1, the officer observed the defendant driving at a higher than normal rate of speed and then, when the defendant made a turn, the defendant drove off the paved portion of the roadway onto the unpaved shoulder. And in *Hicks v. State,* Alaska App. Memorandum Opinion No. 2626 (February 24, 1993), 1993 WL 13156640 at *1, the officer observed the defendant driving at an unusually slow speed (35 miles per hour in a 55–mile–per–hour zone) when the slow speed could not be attributed to driving conditions. The defendant then pulled off the road and stopped his vehicle, with its turn signal blinking, about four car lengths beyond the only driveway in that vicinity— leading the officer to suspect that the driver had missed his turn.

In all these cases, the officer's observations gave rise to an objective, substantial possibility—not just a hunch—that the defendant was driving while impaired.[13]

In Burnett's case, Trooper Altepeter saw Burnett perform a normal stop at a stop sign, and also saw Burnett drive normally after making a left turn. The only suspicious activity that Altepeter observed was Burnett's method of making the turn: Burnett "peeled out" by spinning his tires as he traversed the initial one-third to one-half of the intersection.

Altepeter testified that the roads were not particularly icy, and thus road conditions seemingly did not account for the spinning tires. Altepeter further testified that, based on his training and experience, the fact that Burnett spun his tires for that distance caused Altepeter to suspect that Burnett was under the influence. However, Altepeter did not explain what aspect of his training and experience led him to this conclusion, other than the fact that Burnett's behavior was unusual.

The facts of Burnett's case are similar to the facts of two cases from other states— cases where courts held that a driver's act of unnecessarily spinning their vehicle's tires, without more, did *not* establish reasonable suspicion to believe that the driver was impaired.

In *State v. Pepin,* 155 N.H. 364, 920 A.2d 1209 (2007), the officer stopped the defendant's vehicle because the defendant's tires squealed when he entered an intersection after the light changed.[14] The officer testified that it was shortly after midnight on "club night", and that road conditions were dry (in other words, the road conditions did not explain the squealing tires).[15]

The officer testified that he stopped Pepin because he suspected that Pepin had violated a statute that barred drivers from engaging in "exhibition of speed or acceleration".[16] The New Hampshire Supreme Court concluded that Pepin's act of briefly making his tires squeal, without more, did not establish reasonable suspicion that the road racing statute had been violated.[17] The New Hampshire court also ruled that, in the absence of evidence suggesting that Pepin had been drinking (for example, evidence that he had just pulled out of a bar parking lot, or that there were bars in the immediate vicinity), Pepin's act of briefly squealing his tires did not establish reasonable suspicion that he was intoxicated.[18]

The Texas decision of *State v. Guzman,* 240 S.W.3d 362 (Tex.App.2007), presents facts even closer to Burnett's case. In *Guzman,* the defendant was stopped because, after his traffic light turned green, and as he accelerated through the intersection, one of his rear tires spun for three to six seconds, causing the tire to smoke and to appear

---

13. *See State v. Moran,* 667 P.2d at 736.

14. 920 A.2d at 1210.

15. *Ibid.*

16. *Id.* at 1211 (citing N.H. Statute § 265:75).

17. *Id.* at 1212.

18. *Ibid.*

shiny.[19] The Texas Court of Appeals ruled that the spinning tire, standing alone, did not establish reasonable suspicion to believe that the defendant was intoxicated.[20]

Compare the decision of the Texas Court of Criminal Appeals in *Foster v. State*, 326 S.W.3d 609 (Tex.Crim.App.2010), where the court held that there *was* reasonable suspicion to believe that the defendant was intoxicated when, late at night in the bar district, the officer observed the defendant's vehicle lurch forward while it was stopped at a red light, then make a revving sound, and then lurch forward again.[21]

 Like the New Hampshire and Texas courts whose decisions we have summarized here, we conclude that Burnett's act of unnecessarily spinning his tires, without more, is not a sufficient indication of intoxication to justify a traffic stop for driving under the influence.

■ We address one further issue, in the interest of completeness. The City of Bethel (where this case arose) has enacted traffic ordinances. One of those traffic ordinances, § 10.02.210, is entitled "Turning, starting and signals on turning—Starting and stopping—Starting parked vehicle".[22] This ordinance reads: "The city adopts by reference 13 AAC 02.210 in its entirety."

As we explained in *State v. Hamilton*, 216 P.3d 547, 548 (Alaska App.2009), 13 AAC 02.210 is a state traffic regulation. As originally enacted, subsection (b) of this regula-

tion made it unlawful for a driver to "accelerate a vehicle which is stopped, standing[,] or parked on or along a highway[,] or which is entering a highway, so rapidly as to unnecessarily cause the tires to squeal or spin".[23] However, the Alaska Department of Public Safety repealed this tire-spinning clause of the regulation in 1979.[24]

The City of Bethel enacted its ordinance in 1993. *See* Bethel Ordinance 93–07, § 5. Thus, by the time the City of Bethel adopted 13 AAC 02.210 as the law of Bethel, this state regulation no longer prohibited unnecessary tire-spinning. For this reason, the traffic stop in Burnett's case can not be justified on the theory that Burnett's act of spinning his tires was unlawful of itself.

### Conclusion

Because we conclude that the traffic stop of Burnett's vehicle was unlawful, the evidence obtained as a result of this traffic stop must be suppressed. And because the primary evidence of Burnett's impairment was obtained as a result of this traffic stop, Burnett's conviction for driving under the influence is REVERSED.

19. 240 S.W.3d at 365.

20. *Id.* at 368.

21. *Foster*, 326 S.W.3d at 610, 612, 614.

22. Available at http://www.codepublishing.com/AK/bethel.html.

23. *Hamilton*, 216 P.3d at 548.

24. *Ibid.*